**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| LAWANDA SIMS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UNILEVER UNITED STATES INC.,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Lawanda Sims ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, brings this class action complaint against Defendant Unilever United States, Inc. ("Defendant" or "Unilever") and alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge:

## NATURE OF THE ACTION

1. This is a class action lawsuit regarding Defendant's manufacturing, distribution, advertising, marketing, and sale of dry shampoo products sold under various brands ("Products") that contain dangerously high levels of benzene, a carcinogenic impurity that has been linked to leukemia and other cancers. The Products at issue are:

  (a) Dove Dry Shampoo Volume and Fullness

  (b) Dove Dry Shampoo Fresh Coconut

  (c) Dove Dry Shampoo Fresh and Floral

  (d) Dove Dry Shampoo Ultra Clean

  (e) Dove Dry Shampoo Invisible

1

    (f)     Dove Dry Shampoo Detox and Purify

    (g)     Dove Dry Shampoo Clarifying Charcoal

    (h)     Dove Dry Shampoo Go Active

    (i)     Nexxus Dry Shampoo Refreshing Mist

    (j)     Nexxus Inergy Foam Shampoo

    (k)     Suave Dry Shampoo Hair Refresher

    (l)     Suave Professionals Dry Shampoo Refresh and Revive

    (m)    TRESemmé Dry Shampoo Volumizing

    (n)     TRESemmé Dry Shampoo Fresh and Clean

    (o)     TRESemmé Pro Pure Dry Shampoo

    (p)     Bed Head Oh Bee Hive Dry Shampoo

    (q)     Bed Head Oh Bee Hive Volumizing Dry Shampoo

    (r)     Bed Head Dirty Secret Dry Shampoo

    (s)     Bed Head Rockaholic Dirty Secret Dry Shampoo

2.     The presence of benzene in the Products renders them adulterated, misbranded, and illegal to sell under federal and state law.

3.     Prior to placing the Products into the stream of commerce and into the hands of consumers to use on their bodies, Defendant knew or should have known that the Products contained benzene, but Defendant misrepresented, omitted, and concealed this fact to consumers, including Plaintiff and Class Members, by not including benzene on the Products' labels or otherwise warning about its presence.

4.     Plaintiff and Class Members reasonably relied on Defendant's representations that the Products were safe, unadulterated, and free of any carcinogens that are not listed on the label.

2

5.      Plaintiff and Class Members purchased and used the Products and were therefore exposed to or risked being exposed to the harmful presence of benzene in the Products.

6.      The Products are worthless because they contain or risked containing benzene, a known human carcinogen that is an avoidable ingredient in the Products and their manufacturing process.  Indeed, the presence of benzene renders the Products adulterated, misbranded, and illegal to sell.

7.      Defendant is therefore liable to Plaintiff and Class Members for selling the Products because (i) Defendant represented the Products did not contain benzene and/or failed to disclose the presence of benzene in the Products, and Plaintiff and Class Members would not have purchased the Products or would have paid less for the Products had they known the Products contained or risked containing benzene, and (ii) the Products were adulterated, misbranded, and illegal to sell due to the presence of benzene, and therefore worthless.

**PARTIES**

**I.  Plaintiff**

8.      Plaintiff Lawanda Sims is a resident and citizen of Chicago, Illinois.  Plaintiff has regularly purchased two of the Products, Dove Dry Shampoo Fresh Coconut and Dove Dry Shampoo Detox and Purify, every six or seven months.  Plaintiff most recently purchased these two Products in or about April 2022, but also purchased these two Products in or about June 2021. In both instances, Plaintiff purchased the Products from a Wal-Mart in Forest Park, Illinois.

9.      When purchasing the Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendant that the Products were properly manufactured, free from defects, and safe for their intended use.  The Products likewise contained no representation that they contained or risked containing benzene.

Plaintiff relied on these representations and warranties when deciding to purchase the Products, and these representations and warranties were part of the basis of the bargain. Had Defendant not made the false, misleading, and deceptive representations and omissions regarding the Products containing or risking containing benzene, Plaintiff would not have been willing to purchase the Products or would have paid significantly less for them. Indeed, Plaintiff would not and should not have been able to purchase the Products in the first place because the presence of benzene rendered the Products adulterated and misbranded, and therefore illegal to sell. The Products Plaintiff purchased were worthless because they either contained or risked containing the known carcinogen benzene. Further, the Products Plaintiff purchased were worthless because the presence of benzene rendered the Products adulterated, misbranded, illegal to sell, and therefore worthless. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's deceptive and unfair conduct.

## II. Defendant

10.    Defendant Unilever United States, Inc. is a Delaware corporation with its principal place of business in Englewood Cliffs, New Jersey. Defendant sells the dry shampoo Products throughout the United States, including in the State of Illinois. These Products, including those purchased by Plaintiff and Class Members, are available at various retail stores throughout the United States, including in the State of Illinois. Defendant authorized the false, misleading, and deceptive marketing, advertising, distribution, and sale of the Products.

11.    Defendant is part of an international consumer goods company, the Unilever Group, which consists of two parent companies, Unilever NV and Unilever PLC, together with group subsidiaries, and operates as a single economic entity.

4

12.     Unilever NV is a public limited company registered in the Netherlands, which has listings of shares and depositary receipts for shares on Euronext Amsterdam and of New York Registry Shares on the New York Stock Exchange.

13.     Unilever PLC is a public limited company registered in England and Wales which has shares listed on the London Stock Exchange and, as American Depositary Receipts, on the New York Stock Exchange.

14.     The Unilever Group has company headquarters in Rotterdam, Netherlands, London, England, and the United States.  The Unilever Group operates in the United States under its subsidiary Unilever United States, Inc.

## JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class who are diverse from Defendant, and (4) there are more than 100 Class members.

16.     This Court has personal jurisdiction over Defendant because the claims asserted in this complaint arise out of Defendant's contacts with this district.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this complaint occurred in this state.

## FACTUAL ALLEGATIONS

### I.  Unilever's History in the Industry

18.     Unilever is a large multinational consumer goods company known for its wide range of personal care and hygiene products, including the antiperspirant Products at issue here.

19.    Unilever owns over 400 brands, and its products are available in 190 countries.

20.    Unilever's products, including its Suave product line, are manufactured, distributed, and sold throughout the United States, including the State of Illinois.

21.    Unilever gained consumers' trust over the last 130 years, and, according to the company, 2.5 billion people use its products each day.[1]

22.    Unilever achieved worldwide sales of approximately $62 billion in 2020, which 42% was specifically derived from personal care products.[2]

23.    Unilever markets and sells dry shampoo products as part of its Dove, Nexxus, Suave, Tresemme, and Bed Head products line.  Each Product is marketed in the same or similar manner in that (i) it is a dry shampoo, (ii) it misrepresents or fails to disclose the presence of benzene (or the risk of the Product containing the same), and (iii) Unilever makes similar representations regarding the quality and safety of the Products.  For instance:

(a)    For Dove, Unilever represents it "want[s] to give you products you can trust" and that it "care[s] about how we make our products and what goes into them."[3]

(b)    For Nexxus, Unilever notably states that to "find out what is in Nexxus products," consumers should "check the product label for details or check the ingredients tab on the individual product pages."[4]

---

[1] *2020 Full Year Results*, Unilever (Feb. 4, 2021), https://www.unilever.com/Images/ir-q4-2020-full-announcement_tcm244-558959_en.pdf

[2] *Id*.

[3] https://www.dove.com/us/en/stories/about-dove.html

[4] https://www.nexxus.com/us/en/faq/.

(c)    For Suave, Unilever represents "the brand has provided high-quality, value products that work as well as premium brands."[5]

(d)    For TRESemmé, Unilever represents "TRESemmé products use only the highest quality ingredients to create safe, science-backed, professional-quality formulas to give you salon quality hair at home."[6]

## II.    Benzene Is a Known Human Carcinogen

24.    The World Health Organization and the International Agency for Research on Cancer have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[7]

25.    The Department of Health and Human Services has determined that benzene causes cancer in humans.[8]

26.    "IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma."[9]

---

[5] *Suave*, Unilever, https://www.unileverusa.com/brands/beauty-personal-care/suave/ (last visited Nov. 4, 2022).

[6] https://www.tresemme.com/us/en/about-us/facts-on-tresemme-product-ingredient-safety.html.

[7] *IARC Monographs on the Identification of Carcinogenic Hazards to Humans: List of Classifications*, WHO, https://monographs.iarc.who.int/wp-content/uploads/2019/07/Classifications_by_cancer_site.pdf (last updated July 1, 2022).

[8] *Facts About Benzene*, CDC (last updated Apr. 4, 2018) https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

[9] *Benzene and Cancer Risk*, American Cancer Society (last updated Jan. 5, 2016) https://www.cancer.org/cancer/cancer-causes/benzene.html.

27.    The World Health Organization has stated "[h]uman exposure to benzene has been associated with a range of acute and long-term adverse health effects and diseases, including cancer and haematological effects."[10]

28.    Benzene exposure has been linked with acute lymphocytic leukemia, chronic lymphocytic leukemia, multiple myeloma, and non-Hodgkin lymphoma.[11]

29.    The NIOSH and CDC identify "target organs" associated with human exposure to benzene to include: "eyes, skin, respiratory system, blood, central nervous system, bone marrow.[12]

30.    The CDC warns that "[b]enzene works by causing cells not to work correctly. For example, it can cause bone marrow not to produce enough red blood cells, which can lead to anemia. Also, it can damage the immune system by changing blood levels of antibodies and causing the loss of white blood cells."[13]

### III.  Benzene Is Primarily Used in Industrial Processes and Is Highly Regulated

31.    The CDC states that "[s]ome industries use benzene to make other chemicals that are used to make plastics, resins, and nylon and synthetic fibers. Benzene is also used to make some types of lubricants, rubbers, dyes, detergents, drugs, and pesticides."[14]

---

[10] https://www.who.int/teams/environment-climate-change-and-health/chemical-safety-and-health/health-impacts/chemicals/benzene.

[11] *Id.*

[12] *NIOSH Pocket Guide to Chemical Hazards: Benzene*, CDC, https://www.cdc.gov/niosh/npg/npgd0049.html (last updated Oct. 30, 2019).

[13] *Facts About Benzene*, *supra*.

[14] *Id.*

32.      Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals.[15]

33.      The FDA currently recognizes the danger of benzene and, as a result, has claimed it should not be used in the manufacture of any component of a drug product due to its unacceptable toxicity effect.[16]

34.      Where the use of benzene or other Class 1 solvents is ***unavoidable***, the FDA has stated that the levels should be restricted, and benzene is restricted under such guidance to 2 parts per million ("ppm").[17]

## IV.  Exposure to Benzene in any Amount Is Extremely Dangerous

35.      A 1939 study on benzene stated that "exposure over a long period of time to any concentration of benzene greater than zero is not safe."[18]

36.      A 2010 study summarized the epidemiological studies of the carcinogenic effects of benzene exposure and provided an overview of the hematotoxic effects of benzene.[19] The study concluded:

---

[15] *Benzene*, National Cancer Institute, https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene (last updated Jan. 14, 2019).

[16] David Light et al., *Valisure Citizen Petition on Benzene in Body Spray Products* (Nov. 3, 2021), https://assets-global.website-files.com/6215052733f8bb8fea016220/626af96f521a0584e70e50eb_Valisure%20FDA%20Citizen%20Petition%20on%20Body%20Spray%20v4.0%5B260%5D.pdf (the "*Valisure Citizen Petition*").

[17] *Id.*

[18] F.T. Hunter, *Chronic Exposure to Benzene (Benzol): The Clinical Effects*, 21 J. Indus. Hygiene & Toxicology 331 (1939), https://www.cabdirect.org/cabdirect/abstract/19402700388.

[19] Martyn T. Smith, *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 ANN. REV. PUB. HEALTH 133 (2010), https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.

(a)    There is probably *no safe level* of exposure to benzene, and *all exposures* constitute some risk in a linear, if not supralinear, and additive fashion.

(b)    Exposure to benzene can lead to multiple alterations that contribute to the leukemogenic process, indicating a multimodal mechanism of action.

(c)    Benzene is a ubiquitous chemical in our environment that causes acute leukemia and probably other hematological cancers.

37.    The CDC has stated that ways in which people "could be exposed to benzene" include[20]:

(a)    Outdoor air contains low levels of benzene from tobacco smoke, gas stations, motor vehicle exhaust, and industrial emissions.

(b)    Indoor air generally contains levels of benzene higher than those in outdoor air. The benzene in indoor air comes from products that contain benzene such as glues, paints, furniture wax, and detergents.

(c)    The air around hazardous waste sites or gas stations can contain higher levels of benzene than in other areas.

(d)    Benzene leaks from underground storage tanks or from hazardous waste sites containing benzene can contaminate well water.

(e)    People working in industries that make or use benzene may be exposed to the highest levels of it.

(f)    A major source of benzene exposure is tobacco smoke.

---

[20] *Facts About Benzene*, *supra*.

38.     The NIOSH and CDC identify "exposure routes" for benzene to include: "inhalation, skin absorption, ingestion, skin and/or eye contact."[21]

39.     "Direct exposure [to benzene] of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[22]

40.     Skin absorption is particularly concerning as there have been multiple FDA studies showing that structurally similar chemicals in sunscreen products are found in the blood at high levels after application to exposed skin.

41.     Benzene exposure from body sprays is especially troubling because the spray is directly onto the skin, with the remnants flying through the air likely to be at least partially inhaled by the user and absorbed into their lungs. Thus, even a relatively low concentration limit can result in very high total benzene exposure.

42.     The FDA allows for up to 2 parts per million of benzene in drug products where the use of benzene is "unavoidable."  Such a limit does not apply to cosmetic products like the Products at issue.  Even if it did, the "FDA currently recognizes the high danger of this compound and lists it as a 'Class 1 solvent' that 'should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity.'"[23] Moreover, the Products are not designed to contain benzene when properly manufactured. Finally, "the dry shampoos tested are cosmetics, not drugs, and contain no active pharmaceutical ingredient for therapeutic purpose; therefore, any significant detection of benzene could be

---

[21] *NIOSH Pocket Guide*, *supra*.

[22] *Facts About Benzene*, *supra*.

[23] VALISURE CITIZEN PETITION ON BENZENE IN DRY SHAMPOO PRODUCTS, at 1, https://assets-global.website-files.com/6215052733f8bb8fea016220/6360f7f49903987d8f4f4309_Valisure %20FDA%20Citizen%20Petition%20on%20Benzene%20in%20Dry%20Shampoo%20Products _103122.pdf.

deemed unacceptable."[24]  Thus, the use of benzene is not unavoidable in cosmetic products, including the Products at issue here, to the extent such a limit applies.

## V.  Discovery of Benzene in the Products

43.    In October 2022, Unilever announced that "select lot codes of dry shampoo aerosol products produced prior to October 2021 from Dove, Nexxus, Suave, TIGI (Rockaholic and Bed Head), and TRESemmé" were being recalled "due to potentially elevated levels of benzene."  Unilever instructed consumers to "stop using the affected aerosol dry shampoo products."[25]

44.    This is not Unilever's first recall concerning the presence of benzene.  In November 2021, Valisure, an independent pharmacy and laboratory registered with the FDA, detected elevated and unacceptable levels of benzene in Unilever's Suave-brand antiperspirant products.[26]  In March 2022, Unilever subsequently recalled two lots of its Suave antiperspirant products due to the presence of benzene.[27]

45.    While Unilever did not list the specific benzene content found in the Products, it is likely the levels exceed the 2 ppm concentration limit for "unavoidable" uses per FDA guidance, given Unilever's prior track record.  However, because benzene is not a requisite

---

[24] *Id.* at 7.

[25] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/unilever-issues-voluntary-us-recall-select-dry-shampoos-due-potential-presence-benzene.

[26] VALISURE CITIZEN PETITION ON BENZENE IN BODY SPRAY PRODUCTS, at 12-13, https://assets-global.website-files.com/6215052733f8bb8fea016220/626af96f521a0584e70e50eb_Valisure%20FDA%20Citizen%20Petition%20on%20Body%20Spray%20v4.0%5B260%5D.pdf

[27] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/unilever-issues-voluntary-nationwide-recall-suave-24-hour-protection-aerosol-antiperspirant-powder.

component of manufacturing or packaging dry shampoos, its presence in the Products is not unavoidable and "any significant detection of benzene could be deemed unacceptable."[28]

46.     Indeed, "[t]he presence of this known human carcinogen in dry shampoo products that are regularly used indoors and in large volumes makes this finding especially troubling."[29]

47.     The Products are not designed to contain benzene, and no amount of benzene is acceptable in dry shampoo products such as the Products manufactured, distributed, and sold by Defendant.  Thus, any amount of benzene in the Products renders them adulterated and illegal to sell.

48.     Further, although Defendant lists the ingredients on the Products' labels, Defendant failed to disclosure on the Products' labeling or anywhere in Defendant's marketing that the Products contain or risked containing benzene.  For instance, the labeling for one of the Dove products lists various ingredients, none of which are benzene:

 

---

[28] VALISURE CITIZEN PETITION ON BENZENE IN DRY SHAMPOO PRODUCTS, at 2.

[29] *Id.*

49.    Upon information and belief, Defendant has never conducted a "risk benefit assessment" regarding the use of benzene as a residual solvent in its Products, much less "strongly justified" its use before the FDA.  Nor is the use of benzene as a residual solvent in manufacturing dry shampoo products "supported by the safety data" in light of the known health risks associated with exposure to benzene as detailed herein.

50.    Defendant's recall of the Products also leaves much to be desired.  Namely:

(a)    The recall is limited to products purchased *before* October 2021, even though products sold after this date likely continue to be contaminated.  Further, the recall is limited to only specific lots of the Products.

(b)    To get compensation under the recall, consumers are required to have proof of purchase, which is unlikely for disposable products bought at retail stores that are over a year old.  Without proof of purchase, consumers are limited to a cash refund for *one* product, despite the fact that consumers buy such products regularly.    Making matters even more difficult, the link to Defendant's recall is not listed on the FDA's recall notice.

(c)    Defendant failed to adequately publicize the recall such that consumers were aware of it.

(d)    Although Defendant states "[a]n internal investigation identified the propellant as the source, and Unilever has worked with its propellant suppliers to address this issue,"[30] this is cold comfort to consumers who already used and were exposed to Defendant's dangerous products.  This is a likely result given the recall was announced in November 2022 but covered products sold

---

[30] https://www.unileverrecall.com/.

over a year ago.  Further, given this is Defendant's *second* benzene-related recall in the last year, any such promises are hollow.

(e)    In its recall announcement, Defendant does not disclose how many products it tested or what levels of benzene were detected in those products. The failure to disclose such information is concerning, since there is "no safe level of benzene" exposure.

## VI.  Benzene Renders the Products Adulterated, Misbranded, and Illegal to Sell

51.    Dry shampoo products are "cosmetic" products that are regulated by the U.S. Food and Drug Administration.[31]

52.    The FDA has several safety and effectiveness regulations in place that govern the manufacture and marketing of all cosmetic products, including safety data on its ingredients.[32]

53.    As cosmetics products regulated by the FDA, the Products are deemed adulterated if they "bear[] or contain[] any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling … or under such conditions of use as are customary or usual."  21 U.S.C. § 361(a).

54.    A cosmetic is also adulterated "[i]f it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health."  21 U.S.C. §§ 361(c).

---

[31] VALISURE CITIZEN PETITION ON BENZENE IN DRY SHAMPOO PRODUCTS, at 1.

[32] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated*, FDA, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated (last updated Mar. 2, 2022).

55.    A cosmetic is misbranded if "its labeling is false or misleading in any particular," and if its packaging does not bear "a label containing … an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count."  21 U.S.C. §§ 362(a)-(b)(2).

56.    Any cosmetic product that is adulterated or misbranded is illegal to sell.  21 U.S.C. § 331(a).  Adulterated and misbranded products thus have no economic value and are legally worthless.

57.    The Illinois Food, Drug and Cosmetic Act ("IL FDCA") has expressly adopted the federal labeling requirements as its own. The definition of "adulterated" as defined by 410 ILCS 620/14 is exactly the same as the FDCA.

58.    The presence of benzene renders the Products adulterated *and* misbranded.  As alleged above, benzene is a poisonous and deleterious substance that has been linked to cancer and is dangerous at any level.  The Products were also manufactured in such an insanitary way that they became contaminated with benzene, as indicated by Unilever's *two* benzene-related recalls in the past year.  Thus, the Products are adulterated.

59.    The Products' labeling also failed to disclose the existence of benzene in the Products, and the ingredients section of the Products' labeling does not list "benzene" as an ingredient.  Therefore, the Products are also "misbranded."

60.    The FDA's limit of 2 ppm for benzene in *drug* products does not apply to *cosmetic* products like the Products at issue.  Even if it did, such guidance only permits up to 2 ppm benzene in a drug product if its use in the manufacturing process is "unavoidable."  Given the long history and widespread use of dry shampoo products without any benzene contamination, the use of benzene in the Products is not "unavoidable," and *any* level of benzene in the Products is therefore unacceptable.

61.     Regardless, Defendant's Products likely contain levels of benzene above 2 ppm.

62.     Defendant could have avoided any potential for benzene contamination in the Products by changing the manufacturing process or raw ingredients, and the Products could have been sold with absolutely no benzene in them.

63.     The mere presence of benzene—which, upon information and belief, resulted from Defendant's failure to properly manufacture the Products—renders the Products both adulterated and misbranded under the FDCA for the reasons stated above, and therefore illegall to sell and worthless.

64.     As alleged herein, Defendant has violated the FDCA, the IL FDCA, the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), and committed unjust enrichment.  Defendant engaged in unfair practices by selling adulterated and misbranded Products that are illegal to sell and therefore worthless, and engaged in deceptive practices by committing misrepresentations and omissions surrounding benzene contamination affecting the Products.

65.     If Defendant had disclosed to Plaintiff and putative Class Members that the Products contained or risked containing benzene and thus risked users to benzene exposure, Plaintiff and putative Class Members would not have purchased the Products or they would have paid less for the Products.

66.     As a seller of a cosmetic, Defendant had and has a duty to ensure that its Products did not and do not contain excessive (or any) level of benzene, including through regular testing, especially before the Products injecting into the stream of commerce for consumers to use on their bodies.  But based on its recall—the second this year concerning benzene—Defendant

17

made no reasonable effort to test its Products for benzene or other impurities. Nor did it disclose to Plaintiff in any advertising or marketing that its dry shampoo products contained benzene.

67. To the contrary, Defendant represented and warranted, expressly and impliedly, that the Products were of merchantable quality, complied with federal and state law, and did not contain carcinogens or other impurities such as benzene.

## VII. Defendant's Knowledge, Misrepresentations, Omissions, and Concealment of Material Facts Deceived Plaintiff and Reasonable Consumers

68. The Products contain isobutane as a propellant, which Defendant identified as the source of contamination of benzene.

69. Aerosols contain volatile hydrocarbons, like butane or isobutane, as propellants. These propellants are derived from crude oil and manufactured in oil refineries where a variety of other hydrocarbons, including benzene, are produced.

70. Because the chemicals are derived from the same sources in the same facilities, there is high potential for benzene contamination in the processing of butane.

71. Manufacturing companies that work with butane understand the risks of benzene contamination.[33]

72. Defendant, a large, sophisticated corporation in the business of manufacturing, distributing, and selling products containing aerosol propellants such as butane, knew or should have known of the risks of benzene contamination.

73. Defendant's use of butane as a propellant therefore put them on notice of the risk of benzene contamination in the Products.

---

[33] *See, e.g.*, *Butane Safety Data Sheet*, Whiting, https://whiting.com/wp-content/uploads/Butane-SDS.pdf (last updated Oct. 30, 2013) ("MAY CONTAIN TRACE AMOUNTS OF BENZENE WHICH CAN CAUSE CANCER OR BE TOXIC TO BLOOD-FORMING ORGANS.").

74.    Defendant sold dry shampoo aerosol products containing butane during the class period despite Defendant's knowledge of the risk of benzene contamination.

75.    Federal and state regulatory regimes require that labeling for cosmetic products identify each ingredient.  21 U.S.C. § 362(b).

76.    Benzene is not listed on the Products' labels as an ingredient, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products.  This is despite Unilever telling consumers to "check the product label for details or check the ingredients tab on the individual product pages" to find out what is in its Products.[34]

77.    Defendant has engaged in deceptive, untrue, and misleading advertising by making representations regarding the safety of the Products, including assuring consumers that:

(a)    "[t]o keep people safe, we conduct two types of consumer safety risk assessment: ingredient safety and microbiological safety. Ingredient safety assessments evaluate the potential effects an ingredient in our products could have on the body;"[35]

(b)    "[t]he safety of our products is our top priority. That is why each new product innovation is evaluated systematically and scientifically by our team in the Safety and Environmental Assurance Centre (SEAC).  Our scientists consider any safety risks to the consumers who use our products, to the workers who

---

[34] https://www.nexxus.com/us/en/faq/.

[35] *Keeping people and the environment safe*, Unilever, https://www.unilever.com/planet-and-society/safety-and-environment/keeping-people-and-the-environment-safe/ (last visited Aug. 17, 2022).

make them, and to the environment to ensure all our products are safe to use;"[36]

(c)     "Before making our products available to consumers, we make health and safety our top priority;"[37]

(d)     For Dove, Unilever represents it "want[s] to give you products you can trust" and that it "care[s] about how we make our products and what goes into them";[38]

(e)     For Suave, Unilever represents:

   i.     "All Suave formulas are safe to use and meet the highest global standards in safety and quality";[39]

   ii.     "We rigorously assess all Suave products to ensure all ingredients, manufacturing and labeling comply with applicable laws and regulations all over the world";[40]

   iii.     "testing [is] done to ensure that consumers will get a quality product that is safe and stable for use under different temperature and humidity conditions";[41]

---

[36] *Id.*

[37] *Trust in Suave*, Suave, https://www.suave.com/us/en/dmdm-hydantoin-products-information.html (last visited Nov.. 4, 2022).

[38] https://www.dove.com/us/en/stories/about-dove.html

[39] *Id.*

[40] *Id.*

[41] *Id.*

        iv.    "safety assessments . . . [are conducted to] make sure that we only use what is needed to provide safe and effective products";[42]

        v.    "regulatory assessment [is conducted to] ensure[] that our products, their ingredients, how they are manufactured and labeled comply with all federal and state laws";[43] and

        vi.    "we focus on one thing. Creating quality products"[44]

(f)    For TRESemmé, Unilever represents "TRESemmé products use only the highest quality ingredients to create safe, science-backed, professional-quality formulas to give you salon quality hair at home";[45]

78.    Defendant made all of these assurances regarding the safety and quality of its Products despite the fact that it was selling adulterated, misbranded, and therefore illegally sold and worthless Products to consumers.

79.    Further, Defendant made all of these assurances regarding the safety and quality of its Products without disclosing to consumers that its Products contain elevated levels of a cancer-causing chemical (benzene). This is misleading to consumers.

80.    Moreover, Plaintiff and the putative Class members were exposed to one or more of these representations during the class period and relied on one or more of these representations in deciding to purchase Defendant's Products. In addition, although the Products

---

[42] *Id.*

[43] *Id.*

[44] *About*, Suave, https://www.suave.com/us/en/about.html (Aug. 18, 2022).

[45] https://www.tresemme.com/us/en/about-us/facts-on-tresemme-product-ingredient-safety.html.

were found to contain benzene, Defendant does not list benzene among the ingredients anywhere

on its website, and nothing on the Products' labels otherwise insinuate, state, or warn that the

Products contain benzene. Again, such misrepresentations mislead consumers regarding the

safety and quality of the Products.

81.      With respect to benzene in particular, Defendant recently added a section to its

Suave website (after its first recall) titled "Controlling for Benzene," which states:

> Benzene is not an ingredient that we add to our products. Any
> benzene detected in the final product usually occurs because of its
> natural presence in certain raw materials. We have strict quality
> controls in place that limit the presence of benzene in our deodorant,
> skincare and haircare products and require that any traces found fall
> within defined safety levels. All of our products are rigorously
> assessed by our safety scientists and meet the highest global
> standards in quality and safety as well as applicable laws and
> regulations, so that you can have complete trust in Suave.[46]

82.      Thus, contrary to its claims, Defendant does not have "strict quality controls in

place that limit the presence of benzene in our … haircare products require that any traces found

fall within defined safety levels."[47]  If that were true, Unilever would not have issued a *second*

benzene-related recall within the last year, and a citizen's petition would not have found

significant and elevated levels of benzene in Unilever's antiperspirant products.

83.      As such, Defendant's advertising campaigns are false and misleading.  Plaintiff

would not have purchased the Products had they been truthfully and accurately labeled.

84.      The presence of benzene in the Products also renders the Products misbranded

and adulterated and therefore illegal and unfit for sale in trade or commerce.

---

[46] https://www.suave.com/us/en/dmdm-hydantoin-products-information.html.

[47] *Id.*

22

85.    If Defendant had fulfilled their quality assurance obligations, Defendant would have identified the presence of the benzene contaminant through routine and required testing.

86.    Further, had Defendant adequately tested its Products for benzene and other carcinogens and impurities, it would have discovered that its Products contained benzene—even at levels above the FDA's limit (to the extent even applicable)—making those Products illegal to distribute, market, and sell.

87.    Defendant also knew or should have known about the carcinogenic potential of benzene because it is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, meaning that it is "carcinogenic to humans."[48]

88.    Accordingly, Defendant knowingly, recklessly, or at least negligently, introduced contaminated, adulterated, and misbranded Products containing or risked containing dangerous amounts of benzene into the U.S. market.

89.    By marketing and selling its body spray products in the stream of commerce with the intent that its Products would be purchased by Plaintiff and Class Members, Defendant warrants that the Products are safe to use rather than adulterated dry shampoos containing a dangerous, cancer-causing chemical.

90.    Defendant did not disclose the actual or potential presence of benzene in its drs shampoo products on the Products' labeling, advertising, marketing, or sale of the Products.

91.    Defendant's concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies.

---

[48] https://monographs.iarc.who.int/wp-content/uploads/2019/07/Classifications_by_cancer_site.pdf.

Consumers such as Plaintiff and Class Members make purchasing decisions based on the representations made on the Products' labeling, including the ingredients listed.

92.     Defendant knows that if it had not mispresented or omitted that the Products contained benzene, then Plaintiff and Class Members would not have purchased the Products.

## VIII.   Injuries to Plaintiff and Class Members

93.     When Plaintiff purchased Defendant's Products, Plaintiff did not know, and had no reason to know, that Defendant's Products contained or risked containing the harmful carcinogen benzene.  Not only would Plaintiff not have purchased Defendant's Products had they known the Products contained benzene, but Plaintiff would also not have been capable of purchasing them if Defendant had done as the law required and tested the Products for benzene and other carcinogens and impurities, because the presence of benzene renders the Products adulterated, misbranded, and illegal to sell.

94.     Consumers lack the ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must and rely on Defendant to report truthfully and honestly what the Products contain on the Products' packaging or labels.

95.     Further, given Unilever's position in the health and beauty market as an industry leader, Plaintiff and reasonable consumers, trusted and relied on Unilever's representations and omissions regarding the presence of benzene in the Products.

96.     Yet, when consumers look at the Products' packaging, there is no mention of benzene.  It is not listed in the ingredients section—which is where Unilever tells consumers to look to find out what is in the Products—nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products.  This leads reasonable consumers to believe the

Products do not contain benzene. Indeed, these expectations are reasonable because if the Products are manufactured properly, benzene will not be present in the Products.

97.     No reasonable consumer would have paid any amount for products containing benzene, a known carcinogen and reproductive toxin, much less above the limits set by the FDA (even assuming those allowances apply to Defendant's Products).

98.     Thus, if Plaintiff and Class Members had been informed that Defendant's Products contained or may contain benzene, they would not have purchased or used the Products, or would have paid significantly less for the Products, making such omitted facts material to them.

99.     Defendant's false, misleading, omissions, and deceptive misrepresentations regarding the presence of benzene in the Product are likely to continue to deceive and mislead reasonable consumers and the public, as it has already deceived and misled Plaintiff and Class Members.

100.     Plaintiff and Class Members bargained for dry shampoo products free of contaminants and dangerous substances, and that were properly and legally sold.  Plaintiff and Class Members were injured by the full purchase price of the Products because (i) the Products are worthless, as they are adulterated and contain harmful levels of benzene—or at risk of containing the same, and (ii) Plaintiff and Class Members would not have purchased the Products or would have paid substantially less for them had Defendant disclosed to not falsely representations that the Products did not contain benzene.

101.     As alleged above, Plaintiff and Class Members' Products either contained benzene or were at significant risk of containing the same.

102.    Plaintiff and Class Members are further entitled to statutory and punitive

damages, attorneys' fees and costs, and any further relief this Court deems just and proper.

## CLASS ALLEGATIONS

103.    Plaintiff, individually and on behalf of all others, brings this class action pursuant

to Fed. R. Civ. P. 23.

104.    Plaintiff seeks to represent a class defined as:

> All persons who purchased one or more of Defendant's Products in
> the United States for personal or household use within any
> applicable limitations period ("Class").

105.    Plaintiff also seeks to represent a subclass defined as:

> All persons who purchased one or more of Defendant's Products in
> Illinois for personal or household use within any applicable
> limitations period ("Illinois Subclass").

106.    Plaintiff also seeks to represent a subclass defined as:

> All persons who purchased one or more of Defendant's Products in
> the States of California, Florida, Illinois, Massachusetts, Michigan,
> Minnesota, Missouri, New Jersey, New York, or Washington for
> personal or household use within any applicable limitations period
> ("Consumer Fraud Multi-State Subclass").[49]

---

[49] While discovery may alter the following, the states in the Consumer Fraud Multi-State Class
are limited to those states with similar consumer fraud laws under the facts of this case:
California (Cal. Bus. & Prof. Code § 17200, *et seq.*); Florida (Fla. Stat. § 501.201, *et seq.*);
Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*);
Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*);
Missouri (Mo. Rev. Stat. § 407.010, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New York
(N.Y. Gen. Bus. Law §§ 349 and 350); and Washington (Wash. Rev. Code
§ 19.86.010, *et seq.*).

107.    The Class, Illinois Subclass, and Consumer Fraud Multi-State Subclass shall be collectively referred to as the "Classes."  Members of the Class, Illinois Subclass, and Consumer Fraud Multi-State Subclass shall be collectively referred to as "Class Members."

108.    Excluded from the Class and Subclasses are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entities in which Defendant or its parents and any entities in which Defendant has a controlling interest and its current or former employees, officers, and directors; and (3) individuals who allege personal bodily injury resulting from the use of the Products.

109.    Plaintiff reserves the right to modify, change, or expand the definitions of the Classes based upon discovery and further investigation.

110.    *Numerosity*: The Classes are so numerous that joinder of all members is impracticable. The Classes likely contains thousands of members based on publicly available data.  The Classes are ascertainable by records in Defendant's possession.

111.    *Commonality*: Questions of law or fact common to the Classes include, without limitation:

(a)    Whether the Products contain benzene;

(b)    Whether the presence of benzene in the Products renders the Products adulterated or misbranded;

(c)    Whether a reasonable consumer would consider the presence of benzene in the Products to be material;

(d)    Whether Defendant knew or should have known that the Products contain benzene;

27

(e)    Whether Defendant misrepresented whether the Products contain benzene;

(f)    Whether Defendant failed to disclose that the Products contain benzene;

(g)    Whether Defendant concealed that the Products contain benzene;

(h)    Whether Defendant engaged in unfair practices;

(i)    Whether Defendant engaged in deceptive practices;

(j)    Whether Defendant violated the state consumer protection statutes alleged herein;

(k)    Whether Defendant was unjustly enriched; and

(l)    Whether Plaintiff and Class Members are entitled to damages.

112.    *Typicality*: Plaintiff's claims are typical of the claims of Class Members. Plaintiff and Class Members were injured and suffered damages in substantially the same manner, have the same claims against Defendant relating to the same course of conduct, and are entitled to relief under the same legal theories.

113.    *Adequacy*: Plaintiff will fairly and adequately protect the interests of the Classes and have no interests antagonistic to those of the Classes. Plaintiff has retained counsel experienced in the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case. Counsel intends to vigorously prosecute this action.

114.    *Predominance and superiority*: Questions of law or fact common to Class Members predominate over any questions affecting individual members.  A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all Class Members is impracticable and the amount at issue for each Class Member would not justify the cost of litigating individual claims.  Should individual Class Members be required to bring separate actions, this Court would be confronted with a

28

multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

115.    Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

## **CAUSES OF ACTION**

### **COUNT I**
### **VIOLATIONS OF STATE CONSUMER FRAUD ACTS**
**(On behalf of Plaintiff and the Consumer Fraud Multi-State Subclass)**

116.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

117.    Plaintiff brings this Count on behalf of herself and the Consumer Fraud Multi-State Subclass against Defendant, Unilever.

118.    The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Subclass prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

119.    Plaintiff and Consumer Fraud Multi-State Subclass Members have standing to pursue a cause of action for violation of the Consumer Fraud Acts of the states in the Consumer Fraud Multi-State Subclass because Plaintiff and Consumer Fraud Multi-State Subclass

Members have suffered an injury in fact and lost money as a result of Defendant's actions set forth herein.

120.    Defendant engaged in unfair conduct, including but not limited to selling adulterated and misbranded products in violation of the FDCA.

121.    Defendant engaged in deceptive conduct, including but not limited to misrepresenting that the Products did not contain benzene, and failing to disclose that the Products contained benzene.

122.    Defendant intended that Plaintiff and Consumer Fraud Multi-State Subclass Members would rely upon its unfair and deceptive conduct and a reasonable person would in fact be misled by this deceptive conduct described above.

123.    Given Defendant's position in the health and beauty market as an industry leader, Plaintiff and reasonable consumers trusted and relied on Unilever's representations and omissions regarding the presence of benzene in the Products.

124.    As a result of Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiff and Consumer Fraud Multi-State Subclass Members have sustained damages in an amount to be proven at trial.

125.    In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

**COUNT II**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND**
**DECEPTIVE TRADE PRACTICES ACT**
**815 ILCS 505/1, *et seq.***
**(On behalf of Plaintiff and the Illinois Subclass)**

126.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

127.    Plaintiff brings this Count on behalf of herself and the Illinois Subclass against Defendant.

128.    Plaintiff and other Illinois Subclass Members are persons within the context of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS 505/1(c).

129.    Defendant is a person within the context of the ICFA, 815 ILCS 505/1(c).

130.    At all times relevant hereto, Defendant was engaged in trade or commerce as defined under the ICFA, 815 ILCS 505/1(f).

131.    Plaintiff and the proposed Illinois Subclass are "consumers" who purchased the Products for personal, family or household use within the meaning of the ICFA, 815 ILCS 505/1(e).

132.    The ICFA does not apply to "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer of this State or the United States." 815 ILCS 505/10b(1).

133.    The FDCA prohibits introduction into interstate commerce "of any food, drug, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a).

134.    As the Products are adulterated and misbranded, the FDCA specifically prohibits their introduction into interstate commerce, and thus, actions under the ICFA related to the Products being adulterated and misbranded are not barred by 815 ILCS 505/10b(1).

135.    The ICFA prohibits engaging in any "unfair or deceptive acts or practices … in the conduct of any trade or commerce." ICFA, 815 ILCS 505/2.

136.    The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use

or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act ("UDTPA"). 815 ILCS § 505/2.

137.    Plaintiff and the other Illinois Subclass Members reasonably relied upon Defendant's representation that the Products were safe for personal use and, due to Defendant's omission of the presence of benzene in the Products, Plaintiff read and relied on Defendant's labeling to conclude that the Products were not contaminated with any dangerous substance, including benzene.

138.    Defendant's conduct, as described herein, took place within the State of Illinois and constitutes unfair or deceptive acts or practices in the course of trade and commerce, in violation of 815 ICFA 505/1, *et seq.*

139.    Defendant engaged in unfair conduct in violation of the ICFA, including but not limited to selling adulterated and misbranded products in violation of the FDCA and IL FDCA.

140.    Defendant engaged in deceptive conduct, including but not limited to misrepresenting that the Products did not contain benzene, and failing to disclose that the Products contained benzene.

141.    Defendant violated the ICFA by representing that the Products have characteristics or benefits that they do not have. 815 ILCS § 505/2; 815 ILCS § 510/2(7).

142.    Defendant advertised the Products with intent not to sell them as advertised, in violation of 815 ILCS § 505/2 and 815 ILCS § 510/2(9).

143.    Defendant engaged in fraudulent and/or deceptive conduct which creates a likelihood of confusion or of misunderstanding in violation of 815 ILCS § 505/2; 815 ILCS § 510/2(3).

144.    Prior to placing the Products into the stream of commerce and into the hands of consumers to use on their bodies, Defendant knew or should have known that the Products contained benzene, but Defendant not only failed to properly test and quality-check its Products, but further misrepresented, omitted, and concealed this fact to consumers, including Plaintiff and Illinois Subclass Members, by not including benzene or the risk of benzene contamination on the Products' labels or otherwise warning about its presence.

145.    Defendant intended that Plaintiff and each of the other Illinois Subclass Members would reasonably rely upon the misrepresentations, misleading characterizations, warranties and material omissions concerning the true nature of the Products.

146.    Given Defendant's position in the health and beauty market as an industry leader, Plaintiff and reasonable consumers trusted and relied on Unilever's representations and omissions regarding the presence of benzene in the Products.

147.    Defendant's misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff and each of the other Illinois Subclass Members to be deceived about the true nature of the Products.

148.    Plaintiff and Class Members have been damaged as a proximate result of Defendant's unfair and deceptive violations of the ICFA and have suffered damages as a direct and proximate result of purchasing the Products.

149.    As a direct and proximate result of Defendant's violations of the ICFA, as set forth above, Plaintiff and the Illinois Subclass Members have suffered ascertainable losses of money caused by Defendant's unfair conduct of selling adulterated, misbranded, and illegally sold Products, and its misrepresentations and material omissions regarding the presence of benzene in the Products.

150.    Had they been aware of the true nature of the Products, Plaintiff and Illinois Subclass Members either would have paid less for the Products or would not have purchased them at all.

151.    Based on Defendant's unfair and/or deceptive acts or practices, Plaintiff and the Illinois Subclass Members are therefore entitled to relief, including restitution, actual damages, treble damages, punitive damages, costs, and attorneys' fees, under 815 ILCS 505/10a.

## COUNT III
### UNJUST ENRICHMENT
**(On behalf of Plaintiff and the Classes)**

152.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

153.    Plaintiff brings this Count on behalf of herself and the Classes against Defendant.

154.    This claim is brought under the laws of the State of Illinois.

155.    Defendant's conduct violated, *inter alia*, state and federal law, by manufacturing, advertising, marketing, and selling the Products that were adulterated, misbranded, and thus illegally sold, and while misrepresenting and omitting material facts.

156.    Defendant's unlawful conduct allowed Defendant to knowingly realize substantial revenues from selling the Products at the expense of, and to the detriment or impoverishment of, Plaintiff and Class Members and to Defendant's benefit and enrichment. Defendant has thereby violated fundamental principles of justice, equity, and good conscience.

157.    Plaintiff and Class Members conferred significant financial benefits and paid substantial compensation to Defendant for the Products, which were not as Defendant represented them to be.

158.    Defendant knowingly received and enjoyed the benefits conferred on it by Plaintiff and Class Members.

159.    It is inequitable for Defendant to retain the benefits conferred by Plaintiff and Class Members' overpayments.

160.    Plaintiff and Class Members seek establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, pray for relief and judgment against Defendant as follows:

(a)    Certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as the representative of the Classes, and designating Plaintiff's counsel as Class Counsel to represent the Classes;

(b)    Awarding Plaintiff and Class Members compensatory damages, in an amount to be determined at trial;

(c)    Awarding Plaintiff and Class Members appropriate relief, including but not limited to actual damages;

(d)    For restitution and disgorgement of profits;

(e)    Awarding Plaintiff and Class Members reasonable attorneys' fees and costs as allowable by law;

(f)    Awarding pre-judgment and post-judgment interest;

(g)    For punitive damages; and

(h)    Granting any other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury of all claims so triable.

Dated: November 4, 2022

Respectfully submitted,

*/s/ Gary M. Klinger*
Gary M. Klinger
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel.: (866) 252-0878
gklinger@milberg.com

Nick Suciu III*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Tel.:(313) 303-3472
Fax:(865) 522-0049
nsuciu@milberg.com

Kevin Laukaitis*
Jonathan Shub*
**SHUB LAW FIRM LLC**
134 Kings Hwy E., 2nd Fl.
Haddonfield, NJ 08033
T: (856) 772-7200
F: (856) 210-9088
klaukaitis@shublawyers.com
jshub@shublawyers.com

Sarah N. Westcot**
**BURSOR & FISHER, P.A.**
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 676-9006
swestcot@bursor.com

Max S. Roberts*
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, NY 10019

36

Tel: (646) 837-7150
Fax: (212) 989-9189
mroberts@bursor.com

Charles E. Schaffer*
David C. Magagna Jr.**
**LEVIN, SEDRAN & BERMAN, LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
cschaffer@lfsblaw.com
dmagagna@lfsblaw.com

* Admitted to the General Bar
** *Pro Hac Vice* Application Forthcoming

*Attorneys for Plaintiff*